IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 1:20-cv-00552-CMA-NRN

CURTIS PARK GROUP, LLC,

Plaintiff,

v.

ALLIED WORLD SPECIALTY INSURANCE COMPANY,

Defendant.

# ORDER ON PLAINTIFF'S EMERGENCY MOTION
# FOR PROTECTIVE ORDER (Dkt. #25)

**N. REID NEUREITER**
**United States Magistrate Judge**

This matter comes before the Court on Plaintiff Curtis Park Group's ("Curtis Park") Emergency Motion for Protective Order, filed July 8, 2020. Dkt. #25. I held a Telephonic Discovery Hearing on the issue on July 10, 2020. Dkt. #28.

Recognizing the factual and legal complexity of the dispute, I allowed further briefing by the Parties. *See* Dkt. #29 (Curtis Park's Brief Regarding Privilege and Waiver in Support of its Emergency Motion for Protective Order); Dkt. #33 (Allied World Specialty Insurance Company's ("Allied World") Brief in Response to Curtis Park's Brief Regarding Privilege and Waiver in Support of its Emergency Motion for Protective Order); and Dkt. #34 (Curtis Park's Reply Brief Regarding Privilege and Waiver in Further Support of its Emergency Motion for Protective Order). I denied Defendant Allied World's Motion for Leave to File a Sur-Reply for failure to adequately confer with opposing counsel. *See* Dkt. #42. I heard post-briefing argument from the Parties on

August 27, 2020. Now, being fully informed and for the reasons discussed below, it is hereby **ORDERED** that the Motion is **GRANTED IN PART AND DENIED IN PART**.

**Factual Background**

This is an insurance coverage case arising from a Builders' Risk insurance policy covering construction of a condominium project. The condominium project had a concrete slab that experienced deflection and cracking. The discovery dispute arises from reports and documents created by consultants retained by Curtis Park and its concrete subcontractor to determine the cause of cracks and deflections in the concrete slab and make recommendations for a potential fix. Depending on the cause of the problem, the costs associated with correcting the defect may or may not be covered by the builders' risk insurance policy issued by Allied World.

There are three categories of documents at issue. First is the "Harris Report," a document issued on March 7, 2018 from J.R. Harris & Company, a structural engineering firm, to Mr. Patrick Casey of the Fox Rothschild law firm. *See* Dkt. #31 (submitted for *in camera* review). Second is the so-called "Basham Letter," a letter written on May 17, 2018 to Mr. Todd Hensley, Project Manager at All-Phase Concrete Construction, from Kim Basham, Professional Engineer with KB Engineering. *See* Dkt. #30 (submitted for *in camera* review). The Basham Letter recites some preliminary findings regarding Mr. Basham's investigation of the cause of the slab cracking. The final set of documents at issue are the underlying files, documents, and communications of the J.R. Harris & Company firm that Allied World has subpoenaed. These underlying files were presumably used by Dr. Harris to create the Harris Report. I have reviewed *in camera* both the Harris Report and the Basham Letter.

2

Based on affidavits and representations of the Parties, the Court gleans the following about these documents and the dispute.

In late December 2017, unexpected deflection was discovered in the concrete decks above the parking garage of the construction project. Curtis Park and its contractor, Milender White Residential ("MW"), investigated the property damage to determine a fix. Those two reserved rights against each other and conducted preliminary investigations and repairs.

In the spring of 2018, Curtis Park's outside counsel with Fox Rothschild, Mr. Patrick Casey, retained Dr. James R. Harris as a consulting engineer to analyze the damage to the project. At the time of the retention, Curtis Park says it was anticipating litigation and Mr. Casey requested that Dr. Harris serve as a consultant to preliminarily opine on potential causes for the damage at the project. Dr. Harris produced the Harris Report reflecting his preliminary investigation, and delivered it to Mr. Casey. Mr. Casey says the Harris Report was confidential work product and was intended to be kept confidential in order for Mr. Casey to provide legal assistance to Curtis Park. But, on its face, there is nothing to indicate that the Harris report was intended to be confidential or was to be limited in its circulation. The document does not have any "confidential" notation, does not say it is either "privileged" or "work product," nor suggest that it would be inappropriate to distribute to anyone other than counsel.

Around the same time, the project's concrete subcontractor, All-Phase Concrete Construction, Inc. ("All-Phase"), retained Kim Basham of K.B. Engineering as a structural engineering consultant to analyze observed deflection and resulting damage to the project. All-Phase and MW were working together to address the deflection

Based on affidavits and representations of the Parties, the Court gleans the following about these documents and the dispute.

In late December 2017, unexpected deflection was discovered in the concrete decks above the parking garage of the construction project. Curtis Park and its contractor, Milender White Residential ("MW"), investigated the property damage to determine a fix. Those two reserved rights against each other and conducted preliminary investigations and repairs.

In the spring of 2018, Curtis Park's outside counsel with Fox Rothschild, Mr. Patrick Casey, retained Dr. James R. Harris as a consulting engineer to analyze the damage to the project. At the time of the retention, Curtis Park says it was anticipating litigation and Mr. Casey requested that Dr. Harris serve as a consultant to preliminarily opine on potential causes for the damage at the project. Dr. Harris produced the Harris Report reflecting his preliminary investigation, and delivered it to Mr. Casey. Mr. Casey says the Harris Report was confidential work product and was intended to be kept confidential in order for Mr. Casey to provide legal assistance to Curtis Park. But, on its face, there is nothing to indicate that the Harris report was intended to be confidential or was to be limited in its circulation. The document does not have any "confidential" notation, does not say it is either "privileged" or "work product," nor suggest that it would be inappropriate to distribute to anyone other than counsel.

Around the same time, the project's concrete subcontractor, All-Phase Concrete Construction, Inc. ("All-Phase"), retained Kim Basham of K.B. Engineering as a structural engineering consultant to analyze observed deflection and resulting damage to the project. All-Phase and MW were working together to address the deflection

problem under a reservation of rights, purportedly with the hope of avoiding litigation. All-Phase and MW executed a settlement agreement in March of 2018 to allow All-Phase and MW to work together to address the deflection problem under a full reservation of rights.

All-Phase's lawyer has submitted an affidavit saying that Mr. Basham was retained in anticipation of litigation and was serving as a consultant to investigate and opine on potential causes for the damage. Notably, All-Phase's lawyer in his affidavit does not say that he retained Mr. Basham, only that Mr. Basham "was retained on behalf of All-Phase." Dkt. #29-4 at 3. On May 17, 2018, Mr. Bashman prepared a letter outlining his preliminary engineering findings regarding his investigation and analysis (the Basham Letter). According to All-Phase's lawyer, the Basham Letter "was intended to be kept confidential and was prepared in connection with legal advice and assistance to All-Phase." According to All-Phase's counsel, to the extent that the Basham Letter was shared with other members of the design and construction teams for the project, it was done so under the auspices of a proposed settlement agreement. The Basham Letter was supplemented following a July 2018 meeting that Mr. Basham attended at the project site. All-Phase's lawyer, John Zakham, says that the later version of the Basham Letter was similarly intended to be kept confidential and was prepared in connection with legal advice and assistance to All Phase. It, too, was purportedly shared with other members of the design and construction teams "under the auspices" of the proposed settlement.

Like the Harris Report, there is nothing on the face of the Basham Letter to suggest that it was work product, was intended to be confidential, or that its distribution

4

is to be limited in any way. There is nothing on the document itself suggesting that it was created or provided to other members of the design and construction teams in the context of settlement negotiations. In addition, the Basham Letter was written directly to the Project Manager at All-Phase, not to any attorney. The evidence indicates that All Phase hired Mr. Basham directly and that he was not hired by counsel.

Sometime after the receipt of the March 7, 2018 Harris Report, the document was shared with MW. Mr. Jason Miller of Curtis Park submitted an initial affidavit swearing that "per Curtis Park's request, Mr. Casey [the lawyer] shared the Harris Report with Darren Hinton with MW as part of ongoing settlement communications that were intended to be kept confidential and result in an informal resolution." Dkt. #29-1 at 4, ¶ 9. But the documentation tells a different story. It was Curtis Park's Mr. Miller who wrote a March 13, 2018 letter to MW enclosing the Harris Report. There is nothing in the cover letter that suggests the Report is confidential and should be limited in distribution. There is nothing indicating the Harris Report is being shared in the context of settlement or Rule 408 discussions and would not be admissible at trial. *See* Dkt. #33-7 at 4. Instead, the Harris Report was being provided in connection with Curtis Park's expectation that MW was "to fix all deficiencies and cover all associated costs." *Id.* Mr. Miller later did submit a supplemental affidavit correcting the misimpression that the Harris Report was delivered to MW by counsel. *See* Dkt. #34-1. But that supplemental affidavit supports the conclusion that the Harris Report was not delivered to MW in connection with settlement discussions, but instead was part of Curtis Park "putting MW on notice of the parties' contractual obligations to each other regarding the Project." *Id.* at 4, ¶ 10. This is a business communication pure and simple—putting the

other party on notice of problems with the project and asking for resolution of those problems.

In late March 2018, Curtis Park, in consultation with MW submitted the Builders' Risk insurance claim to Allied World. That claim is the subject of this lawsuit.

On July 9, 2018, there was an "all-hands" meeting at the job site with representatives of Curtis Park, MW, the architect, and other subcontractors, as well as their respective expert consultants. Parties and representatives involved included Curtis Park, MW, Tres Birds (the architect), All-Phase (concrete contractor), KL&A (structural engineer), Harris Rebar (sub-subcontractor). A sign-in sheet for this meeting (Dkt. #33-8) is titled "S. Park Deflection Meeting" and lists twenty-one different participants. Additional listed participants include representatives of Vertex Engineering and Cassaquillo Associates. (None of the briefing explains who Cassaquillo Associates is.) Dr. Harris and Mr. Basham were also present.

Mr. Miller says in his supplemental affidavit that it was his understanding "this meeting was being held as protected settlement communications to encourage all parties and their engineering consultants to discuss deflection-related issues candidly and openly in the interests of the Project." Dkt. #31-4 at 5, ¶ 14. But contrary to Mr. Miller's claimed "understanding" of the nature of the meeting, there is no contemporaneous written documentation that this meeting was held under the auspices of Rule 408, was held in the context of settlement discussions, or was intended to remain confidential. There were no lawyers present. The sign-in sheet says nothing about the meeting being confidential or privileged in any way.

Both Dr. Harris and Mr. Basham presented their findings—as outlined in the Harris Report and the Basham Letter, respectively—to the assembled crowd of project managers, subcontractors, and consultants. At this July 9, 2018 meeting, the structural engineering company KL&A received a copy of the Harris Report and the Basham Letter.

On January 11, 2019, Curtis Park, in coordination with MW, submitted a "Introduction to Claim" document to Allied World describing "the background and details of the Claim and loss, along with supporting cost and other documentation." *See* Dkt. #33-9. The document makes specific reference to the Harris Report findings:

> CPG's consultant, Jim Harris of Harris Engineering, identified the cause of the problem as being the chair supports or 'standees' used to hold the upper mat of rebar in position for the concrete pour. Based on his review of the GPR results, Mr. Harris concluded the most likely cause of the drop in vertical rebar position is tipping of the standees. He further indicated the workmen placing the concrete would likely not notice the drop in elevation of the upper rebar mat.

*Id.* at 12.

Mr. Darren Hinton, a manager with MW, also had forwarded a copy of the Harris Report on to IMA Inc. ("IMA"), which was acting as MW's representative regarding a claim submission to MW's own insurer. *See* Dkt. #34-2 at 4, ¶ 12.

**How were the disputed documents produced?**

It appears that All-Phase, too, had submitted the Basham Letter to IMA in connection with its All-Phase's own claim. The All-Phase claim submission documents (including the Basham Letter) were produced to the Parties in this litigation by IMA in response to a subpoena issued by Allied World. Neither IMA nor All-Phase have asserted any claim of privilege or confidentiality in connection with these documents.

7

On May 21, 2020, Allied World issued a third-party subpoena for documents to KL&A. *See* Dkt. #28-2 at 27. Documents requested included:

> [KLA's] complete physical file and electronically stored information concerning your involvement with the Parties and/or the Project, including but not limited to all documents, correspondence, electronic mail, logs, notes, facsimiles, photographs, audio and/or video recordings, plans, drawings, specifications, submittals, requests for information, change orders, invoices, investigations, reports, consultants, experts, adjusters, bids, invoices, contracts, agreements, policies of insurance and all other written and electronic information and materials of any nature regarding the above-refenced parties and Project.

Dkt. #28-2 at 30. Also requested were "Any and all results, notes, photographs, observations, correspondence or reports, maintained in physical form or electronically, related to any and all actual or potential causes for the excess deflection of the elevated concrete deck at the Project." *Id.* at 31. Consistent with the subpoena request, KL&A's production in response included the Harris Report and Basham Letter.

On June 17, 2020, Curtis Park received KL&A's production in response to Allied World's subpoena. After reviewing these files, Curtis Park's counsel saw that KL&A had produced the Harris Report and Basham Letter that KL&A had obtained during the July 9, 2018 "all-hands" meeting. Curtis Park then sought protection from any further disclosures by serving Allied World with a clawback letter on July 2, 2020 (*see* Dkt. #28-6) and filing the subject emergency motion for a protective order to prevent any other third party from producing similar documents, which Curtis Park maintains were exchanged through "settlement meetings." *See* Dkt. #25.

**Legal Standard**

The proper scope of discovery is "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1). Federal courts have held that the scope of discovery under Rule 26 is broad.

*See Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1520 (10th Cir.1995); *Sanchez v. Matta*, 229 F.R.D. 649, 654 (D.N.M. 2004) ("The federal courts have held that the scope of discovery should be broadly and liberally construed to achieve full disclosure of all potentially relevant information."). The federal discovery rules reflect the courts' and Congress' recognition that "[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). As a result of this policy, subject to proportionality limitations, Rule 26 "contemplates discovery into any matter that bears on or that reasonably could lead to other matter that could bear on any issue that is or may be raised in a case." *Anaya v. CBS Broad., Inc.*, 251 F.R.D. 645, 649–650 (D.N.M. 2007).

Federal district courts have broad discretion over discovery. The trial court has discretion to grant a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure. *Thomas v. Int'l Bus. Machines*, 48 F.3d 478, 482 (10th Cir.1995). Rule 26(c) provides that, upon a showing of good cause, a court may "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," which order may include forbidding disclosure or discovery. Fed. R. Civ. P. 26(c)(1)(A). *Accord Miller v. Regents of the Univ. of Colo.*, 188 F.3d 518, 1999 WL 506520, at *12 (10th Cir.1999) (unpublished table decision) (reasoning that "[t]he district court is in the best position to weigh these variables and determine the appropriate limits because, unlike an appellate court, the district court has the ability to view firsthand the progression of the case, the litigants, and the impact of discovery on parties and nonparties").

**Relevance**

All of the documents at issue in Curtis Park's Emergency Motion for Protective Order are obviously relevant. Two expert engineers performed analyses to determine the cause of the deflection of the concrete slab and discuss potential fixes. The cause of the deflection is at the heart of this insurance dispute. The relevance of these documents is beyond dispute. *See* Fed. R. Evid. 401 (evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action).

Curtis Park claims the documents are not relevant based on *Schultz v. GEICO Casualty Company*, 429 P.3d 844 (Colo. 2018). In that insurance bad faith case against an automobile insurer, the Colorado Supreme Court determined that it would not be appropriate for an insurance company to demand during discovery an independent medical examination ("IME") after it had already decided to pay full policy limits. The Colorado Supreme Court there ruled that in defending against a claim of bad faith, an insurer may present only information that it considered at the time it made the decision to delay or deny the claim. The insurer in that case had ultimately offered the plaintiff her full $25,000 policy limit without first asking her to undergo an IME. *Id.* at 846. However, once the plaintiff filed suit against the insurer for bad faith breach of an insurance contract and unreasonable delay in the payment of covered benefits, the insurer requested that she undergo an IME. *Id.* The supreme court held that this was improper because the evaluation would not develop any new evidence "pertinent to the question of what [the insurer] knew when it made its coverage decision in the case." Id. at 849.

This case, by contrast, is not just about bad faith, but also about whether there is any coverage at all based on the cause of the deflection. In *Schultz*, the insurer had paid full policy limits, so the issue of coverage was no longer in play. Here, evidence as to the cause of the deflection (even evidence acquired after Allied World made its decision) is still relevant to the underlying question as to whether there is coverage for this loss under the policy. Therefore, I do not find the *Schultz* case applicable under these circumstances.

**Claimed Privileges**

Curtis Park claims that the disputed documents fall under the attorney-client and work product privileges. The claim that the documents are attorney-client is based on the assertion that Curtis Park, through outside counsel, retained Dr. Harris as a consulting expert to preliminarily opine on the cause of the project's property damage. Curtis Park makes the same argument with respect to All Phase and its retention of Mr. Basham.

Even if the documents are not covered by attorney-client privilege, Curtis Park also insists that they are protected by the attorney work-product doctrine because Dr. Harris was hired by counsel to conduct an investigation to assist counsel in anticipation of litigation. Curtis Park again makes the same arguments on behalf of All-Phase and the preparation of the Basham Letter.

The party asserting the work-product protection has the burden of demonstrating that it applies and that it has not been waived. *See Kovacs v. Hershey Co.*, No. 04–cv–01881, 2006 WL 2781591, at *10 (D. Colo. Sept. 26, 2006).

For the work-product doctrine to apply, the asserting party must show that the documents or materials were prepared in anticipation of litigation by or for a party or that party's representative. *See* Fed. R. Civ. P. 26(b)(3). Litigation need not necessarily be imminent as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation. *Fox v. Cal. Sierra Fin. Servs.*, 120 F.R.D. 520, 524 (N.D. Cal. 1988) ("There is no requirement that the litigation have already commenced in order for the work-product doctrine to be operative, however, there must be more than a remote possibility of litigation."). If the party asserting the work-product protection establishes entitlement to the protection, Rule 26(b)(3) allows production of attorney work-product materials "only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Fed. R. Civ. P. 26(b)(3). The Tenth Circuit explained that "[w]ork product can be opinion work product, which some courts have held to be absolutely privileged, or non-opinion work product, i.e., fact work product, which may be discoverable under appropriate circumstances." *In re Qwest Commuc'ns Int'l Inc.*, 450 F.3d 1179. 1186 (10th Cir. 2006).

Curtis Park via its affidavits and briefs also attempts to characterize all the communications between the various parties referring to the Harris Report or Basham Letter as "settlement communications." Curtis Park characterizes all the meetings between the participants (the owner, the contractors, the sub-contractors and their various consultants) to address the obvious problem in the slab construction as "settlement" meetings. But there is nothing in the record presented to me that

contemporaneously formalizes these meetings as settlement or compromise meetings—no e-mail notations, no lawyers making pronouncements before the meeting that what was being discussed was intended as settlement communications or, using the language of Rule 408, that the meetings were "compromise negotiations." There was no formal announcement in advance of the meetings that none of the information exchanged for statements made were ever to be used at trial. None of the written communications, including the letter conveying the Harris Report or the Basham Letter indicate that they were sent for the purpose of compromise or settlement. At construction sites, there may frequently be meetings about problems in a project where an issue is identified, blame is placed, and responsibility is taken. For such business meetings and the communications made during such meetings to receive the formal protection under Rule 408 as "statements made during compromise negotiations," there needs to be more contemporary evidence of intent than has been presented here. Therefore, I do not find that Curtis Park has met its burden of proving that these communications are settlement communications governed by Rule 408 of the Federal Rules of Evidence. Instead, they were at most "simply business communications" made before discussions had "crystallized to the point of threatened litigation." *See Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1373 (10th Cir. 1977).

And, even if these communications were covered by Rule 408, it does not mean they would not be discoverable. Rule 408 is a rule of admissibility, barring the use of statements made during compromise negotiations to prove the validity or value of any disputed claim or amount or to impeach by prior inconsistent statement or contradiction. But the rule has exceptions allowing the court to admit the disputed evidence for other

13

purposes. *See* Fed. R. Evid. 408(b) (creating exceptions for use of such compromise negotiation evidence for negating a contention of undue delay, or proving a witness's bias or prejudice). Thus, I do not find that there is a basis for preventing the discovery of this information as statements made during compromise negotiations.

**Any privilege, if it ever existed, has been waived.**

Rather than getting into the intricacies of attorney-client privilege and attorney work product, I conclude that Curtis Park has not done the minimum necessary to maintain the privilege associated with these documents, to the extent such privileges attached to the documents to begin with. "[T]he confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived. The courts will grant no greater protection to those who assert the privilege than their own precautions warrant." *United States v. Ryans*, 903 F.2d 731, 741 n.13 (10th Cir. 1990) (citation omitted).

Here, while Dr. Harris may initially have been hired by counsel with the intention that he engage in a confidential work product assessment of the cause of the deflection and a potential fix, Curtis Park took no meaningful steps to ensure the confidentiality of this analysis. Twenty-one people from numerous entities involved in the construction project attended the July 9, 2018 meeting where these the conclusions of the Harris Report and the Basham Letter were discussed. The documents appear to have been widely circulated. There was no contemporaneous documentation that this meeting and associated discussions were privileged, were for purposes of settlement, or were otherwise confidential and should not be shared. The documents and the conclusions were widely shared among the many participants in the various meetings and their

insurers. *See* Dkt. #33-7 (e-mail string showing that Harris Report was sent by e-mail from Harris Rebar to IMA, and from All-Phase to KB Engineering and GES Tech, without any reference to confidentiality). It makes little sense that Allied World should be prevented from seeing these same documents. Curtis Park's entire Reply Brief (with the associated affidavits) reads as if it were an *ex post* attempt to justify the confidentiality of documents that nobody bothered to ensure would remain privileged and confidential in the first instance.

Therefore, I do not find that this is a case of inadvertent disclosure within the meaning of Fed. R. Evid. 502(b). The disclosures here were not "inadvertent." They were intentional disclosures made to numerous participants in the construction project seeking to identify the cause of the deflection and find a fix. These were business meetings. Thus, the inclusion of the Harris Report and the Basham Letter in response to a valid subpoena by Allied World was similarly not inadvertent—it was an appropriate response by third parties to a valid subpoena. The fact that the third parties who were in possession of the documents (which were not labeled as "confidential" or limited in distribution) produced them without objection is further evidence that Curtis Park had not "taken reasonable steps to prevent disclosure." *See* Fed. R. Evid. 502(b)(2). Indeed, there is no evidence that Curtis Park had taken any steps, reasonable or not, to prevent disclosure or distribution of these documents.

Curtis Park also made specific mention of the Harris Report conclusions in its claim summary presented to Allied World. I do find that by referring to parts of the Harris Report or its contents and referring to Dr. Harris' analysis in materials provided to the

15

insurer, Curtis Park has implicitly waived any claim of work product privilege to that document.

### There has been no waiver of Dr. Harris' underlying notes and materials.

In contrast, with respect to Dr. Harris's underlying notes and other materials, I do not find that Curtis Park has waived the work product privilege with respect to that material. Dr. Harris has not been identified as a testifying witness. There is no evidence that the underlying notes and other analyses that went into the creation of the Harris Report has been distributed or shared with third parties. For that reason, I do find that Curtis Park's assertion of the work product privilege with respect to the Dr. Harris's underlying notes and materials is valid. Unless and until Dr. Harris is named as a witness, those materials should be protected from disclosure.

### Conclusion

Plaintiff Curtis Park's Emergency Motion for Protective Order (Dkt. #25) is **GRANTED** with respect to the underlying Harris notes and material used to create the Harris Report, because that material has been maintained as confidential and not shared with any third parties; and **DENIED** with respect to the Harris Report itself and the Basham Letter.

Dated: September 9, 2020
Denver, Colorado

N. Reid. Neureiter
United States Magistrate Judge