IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 20-cv-00552-CNS-NRN

CURTIS PARK GROUP, LLC,

      Plaintiff,

v.

ALLIED WORLD SPECIALTY INSURANCE COMPANY,

      Defendant.

---

# ORDER

---

Plaintiff Curtis Park Group, LLC ("Curtis Park"), filed this lawsuit in February 2020, arising from the construction of several buildings in Denver, Colorado, and the deflection of the "concrete podium deck"—a slab—atop which those buildings were constructed (ECF No. 5 at 4 ¶ 9).[1] Curtis Park sued Defendant Allied World Specialty Insurance Company ("Allied World") for breach of contract, common law insurance bad faith, and statutory bad faith, alleging that Allied World wrongfully denied coverage under the parties' insurance policy after Curtis Park sought insurance coverage following the slab's deflection (*see, e.g., id.* at 7 ¶ 42). Following a seven-day jury trial, a jury found Allied World liable for breach of the parties' insurance policy and violations of Colorado's bad-faith insurance statute.

---

[1] Unless otherwise noted, record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers placed at the top of the documents.

Before the Court are Allied World's Renewed Motion for Judgment as a Matter of Law Under Federal Rule of Civil Procedure 50(b) (ECF No. 319), and Allied World's Motion for a New Trial Under Federal Rule of Civil Procedure 59(a) (ECF No. 320). For the reasons set forth below, the Court DENIES Allied World's Rule 50(b) and Rule 59(a) motions.

## I. BACKGROUND

Central to this case are specific provisions from the parties' "Builders' Risk Coverage" insurance policy (the "Builders' Risk Policy") (*see, e.g.,* Tr. Ex. 016-041; ECF No. 5 at 4 ¶ 8).[2] "Curtis Park Group, LLC" is defined as the "Named of Insured" under the policy's Declarations (Tr. Ex. 016-001). The Builders' Risk Policy defines "Perils Covered" as "risks of direct physical loss or damage unless the loss is limited or caused by a peril that is excluded" (Tr. Ex. 016-050; *see also id.* at 016-041). The Builders' Risk Policy contains a "Defects, Errors, and Omissions" exclusion, as well as an "Resulting Loss" exception to the exclusion:

> c. **Defects, Errors, And Omissions** –
>
> 1) "We" do not pay for loss or damage consisting of, caused by, or resulting from an act, defect, error, or omission (negligent or not) relating to:
>
>    a) design, specifications, construction, materials, or workmanship;
>    b) planning, zoning, development, siting, surveying, grading, or compaction; or
>    c) maintenance, installation, renovation, remodeling, or repair.
>
> But if an act, defect, error, or omission as described above results in a covered peril, "we" do cover the loss or damage caused by that covered peril.

---

[2] Trial exhibits are referred to by their exhibit and page number; i.e., "Tr. Ex. 016-041" refers to Trial Exhibit 16 at page 41.

(Tr. Ex. 016-052).[3]

After lengthy pretrial proceedings, this case proceeded to trial on March 27, 2023, on all of Curtis Park's claims against Allied World (*see* ECF No. 294).[4] Curtis Park, a special entity company, proceeded at trial under the following theory: Curtis Park developed its "Sustainability Project," or "S*Park," in Denver, Colorado (ECF No. 312 at 132:17–25).[5] S*Park involved the construction of five buildings: "A1, A2, A3, B, and D," as well as the construction of a parking garage "at the bottom of [the] podium slab" (*id.* at 136:3–11; *see also* ECF No. 312 at 185–187).

Curtis Park hired contractors for S*Park's construction, including its general contractor, Milender White Residential, LLC ("Milender White") (*id.* at 133:18–22; *see also* ECF No. 312 at 185:10–11; ECF No. 313 at 313:22–25). All Phase Construction ("All Phase") was Milender White's subcontractor for pouring S*Park's concrete, and Harris Rebar was another one of Milender White's subcontractors for the S*Park project (ECF No. 312 at 133:18–25; *see also* ECF No. 313 at 434:15–25). On December 20, 2017, Curtis Park discovered that S*Park's concrete podium slab, which supported the buildings being constructed, showed "excessive deflection"— sagging (ECF No. 312 at 136:22–24; *see also* ECF No. 313 at 367–68; ECF No. 317 at 1216:9–11). Curtis Park hired a "slew of entities," including J.R. Harris, a structural engineering consultant, to "help [them] figure out" the slab's deflection and understand "what the fix could be"

---

[3] Notwitstanding the parties' competing instructions regarding the "resulting loss" exception, throughout trial the parties referred to the final phrase in the "Defects, Errors, and Omissions" exclusion as the "resulting loss" exception to the exclusion, and the Court does so in its analysis of Allied World's post-verdict motions.

[4] The Court denied Allied World's summary judgment motion and subsequent motion to reconsider its denial of Allied World's summary judgment motion (ECF No. 189; ECF No. 194). The Court also denied the parties' motions to exclude expert testimony, and resolved other substantive pre-trial matters related to proposed jury instructions (ECF No. 258; ECF No. 284).

[5] Pinpoint trial transcript citations are to the trial transcript page, not the ECF-generated page numbers.

(ECF No. 312 at 209:17–25, 210:24–25, 211:6). Dr. Harris prepared a report regarding the slab and its deflection that Curtis Park provided to Allied World in January 2019 (*see, e.g.,* ECF No. 312 at 254:15–24; *id.* at 252:10–15). Curtis Park also performed a series of tests in assessing, for instance, the slab's thickness and its rebar positioning (ECF No. 312 at 212:22–24, 213:1–2). Milender White successfully performed the slab's repairs by strengthening the slab with carbon fiber (ECF No. 312 at 215:2–6, 216:14–23, 217:2–3, 21–22). Notably, Curtis Park "never [was] able to find a cause of the" slab's deflection (ECF No. 312 at 218:2; ECF No. 314 at 740:6–9).

Curtis Park notified Allied World of the slab's deflection and its insurance claim in March 2018 (*see, e.g.,* ECF No. 317 at 1217:7–9). According to Curtis Park, after investigating the cause of the slab's deflection with Milender White and All Phase, Allied World improperly denied Curtis Park insurance coverage for damages related to the slab's deflection pursuant to the parties' Builders' Risk Policy, and on the grounds that, in a supplemental coverage denial letter, Curtis Park's investigation-related conduct violated the "Misrepresentation, Concealment, or Fraud" provision of the parties' policy (ECF No. 312 at 138–40, 148:13–19, 214:20–21; ECF No. 313 at 286–87, 361–63; ECF No. 314 at 644:7–9; ECF No. 316 at 1140:3–11; Tr. Ex. 015-010; Tr. Ex. 016-058).[6] Curtis Park stressed that the Builders' Risk Policy covered "additional separate loss or damage other than damage to the slab," including, for instance, the "wood building" above the slab, and the loss of drywall, doors, and other housing features above the slab (ECF No. 312 at 140:21–25, 141:3–18).[7]

---

[6] Allied World issued a "Reservation of Rights" letter in February 2019 regarding Curtis Park's insurance claim and an initial coverage denial letter in August 2019 (*see, e.g.,* ECF No. 317 at 1236:2–6; Tr. Ex. 35; Tr. Ex. 14).

[7] Curtis Park and Milender White entered into a "close out" agreement (ECF No. 304 at 6). Under this agreement, the parties "closed out" their respective obligations under their construction contract, and agreed that Curtis Park, at both

4

Allied World saw things differently. Allied World's trial defense proceeded from the premise that this was "a construction case," not "a case about insurance bad faith" (ECF No. 312 at 151:23–25). According to Allied World, Milender While constructed a faulty slab, and collaborated with Curtis Park to conceal information regarding its deflection from Allied World—then essentially tried to get Allied World "to pay for something [Milender White] didn't buy insurance for" (*id.* at 152:1–8).

As noted above, Curtis Park notified Allied World of the slab's deflection and its insurance claim in March 2018 (*see, e.g.,* ECF No. 317 at 1217:7–10). Once notified, Allied World employed McLarens, an independent adjuster, to conduct a field inspection regarding Curtis Park's insurance claim and "report back" to Allied World for purposes of Allied World's investigation into and assessment of Curtis Park's insurance claim (*id.* at 1214:14–23; 1218:19–21; 1223:5–7).[8] Allied World worked with Curtis Park over several months to procure information related to the slab's deflection, retaining its own engineers and expert to "confirm and verify" information that Curtis Park provided related to its claim, as well as conduct a "cause and origin investigation" into the slab's deflection (*id.* at 1225:2–4; 1230:6–13; 1231:12–16; 1241:9–16; *see also* Tr. Ex. 046-001).

Ultimately, Allied World concluded that Curtis Park's claim fell within the Builders' Risk Policy's "Defects, Errors, and Omissions" exclusion, and denied insurance coverage on this basis (ECF No. 317 at 1233:4–7; Tr. Ex. 016-052). Paul Aviles, the Head of Claims for Allied World's

---

parties' expense, would seek to recover all costs incurred resulting from the slab, including costs that Milender White paid out of pocket in the first instance (*id.*).

[8] Allied World delegated claims handling authority to Network Adjusters, who assigned McLarens as "the field adjuster for claims handling," including fact-gathering related to Curtis Park's insurance claim (*see* ECF No. 317 at 1238; *id.* at 1239:6–14). Allied World retained responsibility for both entities in the handling of Curtis Park's insurance claim (*id.* at 1239:1–3, 22–24).

North American region, testified at trial that ensuing damage from the slab's deflection "did not result in a covered peril" under the Builders' Risk Policy because the deflection was "all related to defective construction" (ECF No. 317 at 1234:10–12). Fundamentally, Allied World denied coverage because, in its estimation, steel reinforcement within the slab was too low, and the slab's concrete was thin in multiple locations—in the words of Mr. Aviles, "the rebar was placed too low in the slab and it was poured too thin," resulting in the slab's deflection (ECF No. 317 at 1275:11– 17, 1278:17–18). As Allied World explained to Curtis Park, these defects in the construction process triggered the Builder's Risk Policy's "Defects, Errors, and Omissions" exclusion, resulting in Allied World's coverage denial (*see, e.g.,* ECF No. 316 at 1002:4–17; Tr. Ex. 016-052). Moreover, Allied World contended that Curtis Park never disclosed or shared the full contents of Dr. Harris's report during Allied World's claim investigation, amounting to a deliberate misrepresentation and/or concealment of material information in violation of the Builders' Risk Policy's "Misrepresentation, Concealment, or Fraud" provision (Tr. Ex. 015-007–011; ECF No. 313 at 332:7–11; Tr. Ex. 016-058).

Throughout trial, Curtis Park presented expert testimony and evidence regarding the damages it incurred following the slab's deflection.[9]  For example, Curtis Park's expert William McConnell testified that the reasonable "hard costs" associated with the slab's repair—meaning the "actual costs plus the markup for the construction work"—totaled $2,874,000 (ECF No. 316 at 1046:18; *see also id.* at 1041:14–19, 1042:22–25; 1058:19–20; ECF No. 313 at 278:3–14; Tr.

---

[9] Relevant to understanding the nature of Curtis Park's damages, Edward Fronapfel, Curtis Park's engineering expert, opined that the concrete slab was part of S*Park's "substructure," whereas the wood frames above it were considered part of the "superstructure" (ECF No. 314 at 736:16–18; 740:12–18). According to Mr. Fronapfel, the slab's deflection caused a "deformation of the superstructure" that "correspond[ed] to th[e] movement" in the slab, dragging down superstructural elements such as the wood frames, "finishes, tile, drywall, [and] plywood" (*id.* at 740:18–23).

Ex. 024-029; Tr. Ex. 040-003). This included "removal costs," or expenses incurred to access the slab, place the reparative carbon fiber and "fix" the slab, as well as "restoration costs" to "put-back" framing members, adjust cabinets, and electrical work (ECF No. 316 at 1046:17–25, 1047:1–11). Jonathan Alpert, a partner with Curtis Park, and Mr. McConnell testified that Curtis Park's soft costs, or consequential damages suffered "as a result of [the] repair program" for the slab, totaled approximately $1,000,000 (ECF No. 316 at 1019:13–25; 1020:4–10, 16–22; 1021:3–25; 1022:7–25; 1023:1–15; 1043:18–20; 1062:1–5).

At the close of evidence on April 3, 2023, Curtis Park moved under Rule 50(a) for judgment as a matter of law, chiefly on the "misrepresentation defense" (*see* ECF No. 317 at 1445–59). Curtis Park also argued that the Court should resolve several "policy interpretation disputes," and urged additional instructions on the "causation issue" that the Builders' Risk Policy, in Curtis Park's eyes, posed (*id.* at 1454–56). Essentially, Curtis Park raised interpretive concerns regarding the Builders' Risk Policy, particularly in light of some trial testimony distinguishing damage to the slab from its superstructure (*id.* at 1458). After the Court permitted Allied World a response to Curtis Park's motion, the Court denied Curtis Park's Rule 50(a) motion (*see, e.g., id.* at 1465, 1468).

Allied World offered its own Rule 50(a) motion on two issues: first, that as an evidentiary matter, there was "literally no way for the jury to grant judgment on the resulting loss issue;" and second, that only named insurers may recover under the Builders' Risk Policy (ECF No. 317 at 1471–76). Curtis Park responded, contending that the policy covered the project, contrary to Allied World's argument, and that "at a minimum" Curtis Park had put forward "legally sufficient evidence to go to the jury" on the issue of soft costs that it incurred (ECF No. 317 at 1476–78).

The Court denied Allied World's Rule 50(a) motion, noting that Curtis Park presented sufficient evidence for the jury to distinguish deflection-related costs versus superstructure losses in determining which, if any, resulting losses Curtis Park suffered under the Builders' Risk Policy (*id.* at 1479; ECF No. 317 at 1480:3–12).

On April 4, 2023, the jury began deliberating (ECF No. 318 at 1567). Hours later, the jury returned its verdict, finding:

- Curtis Park proved by a preponderance of the evidence the elements of its breach of insurance contract claim against Allied World;

- Allied World did not prove by a preponderance of the evidence that the "Defects, Errors, and Omissions" exclusion in the Builders' Risk Policy applied;

- Curtis Park proved by a preponderance of the evidence that the "resulting loss" exception to the exclusion applied to any loss or damage claim by Curtis Park;

- Allied World did not prove by a preponderance of the evidence the elements of its affirmative defense under the "Misrepresentation, Concealment, or Fraud" claim in the Builders' Risk Policy;

- That Curtis Park's damages caused by Allied World's coverage denial totaled the following: $1,504,827 in repair and replacement costs; $986,391 in replacement damages; and $50,000 in general administration expenses

 (*id.* at 1572–74; *see also* ECF No. 308). The jury found that Allied World did not prove by a preponderance of the evidence the elements of its common law insurance bad faith claim, but did prove by a preponderance of the evidence the elements of its statutory bad faith claim (*id.* at 1574).

Regarding Curtis Park's statutory bad faith claim, the jury determined that Allied World improperly denied paying $2,541,218 in bad faith.[10]

The instant, fully briefed post-verdict motions followed.[11]

## II. ANALYSIS

Having considered the parties' briefs, trial transcripts, attendant evidence, the case file, and relevant legal authority, the Court addresses Allied World's Rule 50(b) motion and Rule 59 motions in turn, denying both.

### A. Allied World's Renewed Motion for Judgment as a Matter of Law Under Federal Rule of Civil Procedure 50(b)

Allied World moves under Federal Rule of Civil Procedure 50(b) for judgment of a matter of law (*see generally* ECF No. 319). Review of Allied World's Rule 50(b) post-verdict motion confirms that it properly "renewed . . . the precise subject matter" of its denied Rule 50(a) motion (*see* ECF No. 317 at 1471–76). *Morgan v. Baker Hughes Inc*., 947 F.3d 1251, 1259 (10th Cir. 2020); *see also Home Loan Inv. Co. v. St. Paul Mercury Ins. Co*., 827 F.3d 1256, 1266 (10th Cir. 2016) ("[A] party may only pursue a ground for relief in a post-verdict Rule 50(b) motion if that same ground for relief was first asserted in a pre-verdict Rule 50(a) motion.").[12] Having determined that Allied World properly renewed its Rule 50(a) challenges, the Court proceeds to

---

[10] Notably, the conduct at issue in the statutory bad faith claim is far broader than a traditional breach of contract claim (*see* ECF No. 304 at 19, 24–25).

[11] Allied World moved to stay attorneys' fees briefing pending resolution on its Rule 50(b) and Rule 59 motions (ECF No. 321). The Court denied Allied World's stay motion (ECF No. 322). The Court also denied American Property and Casualty Insurance Association unopposed motion to appear as amicus curae (ECF No. 326; ECF No. 331).

[12] As noted above, consistent with Rule 50(b), Allied World has advanced an "alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b); *see also Dupree v. Younger*, 143 S. Ct. 1382, 1387 (2023).

analyze the merits of its post-verdict Rule 50(b) motion, considering and rejecting Allied World's arguments in turn.

### 1. Legal Standard

Federal Rule of Civil Procedure 50 sets forth an established procedure for reviewing a party's post-verdict motions. First, after the presentation of evidence, "but before the case is submitted to the jury, Rule 50(a) authorizes either party to move for judgment as a matter of law." *Dupree*, 143 S. Ct. at 1387 (footnote omitted). Once a court denies a party's Rule 50(a) motion, the jury then renders a verdict. *Id.* Second, after the jury issues its verdict, the "disappointed party [may] file a renewed motion for judgment as a matter of law." *Id.*; *see also Home Loan Investment Company*, 827 F.3d at 1266 ("[Defendant] must have properly presented such a challenge to the district court first in a pre-verdict Rule 50(a) motion and then in a renewed Rule 50(b) motion following the verdict." (citation omitted)).

Judgment as a matter of law under Rule 50 is appropriate only where evidence "points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position." *Mountain Dudes v. Split Rock Holdings, Inc.*, 946 F.3d 1122, 1129 (10th Cir. 2019); *see also Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 766 (10th Cir. 2019) ("A party is entitled to [judgment as a matter of law] only if the court concludes that all of the evidence in the record reveals no legally sufficient evidentiary basis for a claim under the controlling law." (citations omitted). In reviewing a Rule 50 motion, courts draw all reasonable inferences "in favor of the nonmoving party" and do not make "credibility determinations[,] weigh the evidence," or "challenge the factual conclusions of the jury." *Liberty Mut. Fire Ins. Co. v. Woolman*, 913 F.3d 977, 983 (10th Cir. 2019) (quotations omitted); *Bill Barrett*, 918 F.3d at 766. Judgment as a matter

of law under Rule 50 is "cautiously and sparingly granted," and granted only when courts are certain that the evidence "conclusively favors one party such that reasonable [people] could not arrive at a contrary verdict." *Mountain Dudes*, 946 F.3d at 1130 (citing *Bill Barrett*, 918 F.3d at 766.

### 2. *Verdict & Proof of "Resulting Loss" Damages*

As a threshold matter, the parties dispute whether the "only damages" awarded by jury were for Curtis Park's "alleged 'resulting losses'" (*compare* ECF No. 319 at 4, *and* ECF No. 341 at 4, *with* ECF No. 334 at 6). Discussed further in the Court's analysis of Allied World's Rule 59 motion, given its finding that the "Defects, Errors, and Omissions" exclusion did not apply, the jury's damages award was not limited to Curtis Park's "alleged 'resulting losses,'" and represents the total amount of damages the jury determined had been proven by a preponderance of the evidence (ECF No. 319 at 4).[13] Nonetheless, to the extent that Allied World argues that Curtis Park failed to prove that it suffered any "resulting loss" damages, the Court disagrees (*id.*; *see also* ECF No. 341 at 3). Curtis Park presented more to the jury regarding its "resulting loss" damages than lawyer arguments—Curtis Park presented the jury with actual evidence of its "resulting loss" damages (*compare* ECF No. 319 at 5, *and* ECF No. 341 at 7, *with* ECF No. 334 at 9–11).

**Hard Costs.** First, evidence introduced at trial clearly demonstrated that Milender White incurred $2,857,157.78 in hard costs (*see, e.g.,* Tr. Ex. 024-029; Tr. Ex. 040-003; ECF No. 316 at

---

[13] For this reason, Allied World's argument that Curtis Park only identified approximately $1,100,000 in "'resulting' damage" in the Final Pretrial Order, whereas Curtis Park's counsel's inappropriately discussed a "never-before-claimed damages amount" of approximately $1,500,000 during closing argument, is immaterial, given especially that in the Final Pretrial Order Curtis Park claimed $2,874,282.64 in total hard costs (ECF No. 319 at 6; ECF No. 186 at 9; ECF No. 318 at 1523:16–24). Indeed, this argument exposes the flaw in its premise—that Curtis Park failed to offer evidence of $1,500,000 in "'resulting' hard costs"—since the jury's verdict did not limit its damages award to Curtis Park's alleged resulting losses (ECF No. 319 at 5). Further, Mr. McConnell's testimony was not inconsistent with the Final Pretrial Order (*see* ECF No. 334 at 12).

1042:22–25).[14] Furthermore, Curtis Park presented evidence of "resulting" hard cost damages (*cf.* ECF No. 319 at 5). In arguing to the contrary, Allied World quibbles with the word choice of Curtis Park's expert William McConnell, insisting that his failure to state *explicitly* that the "removal costs" and "restoration costs" were resulting losses is fatal to Curtis Park's ability to prove that it suffered resulting hard cost damages (*see* ECF No. 319 at 6–7). But Mr. McConnell's testimony ably described and distinguished these categories of costs to the jury (*see, e.g.,* ECF No. 316 at 1046:17–25, 1047:1–11).[15] Accordingly, his testimony provided sufficient evidence for the jury to distinguish and award any "resulting" hard costs—*assuming* its verdict was limited to Curtis Park's "resulting losses," which it was not—for Curtis Park and the jury's verdict to survive Allied World's Rule 50(b) motion (ECF No. 334 at 11). *See, e.g.,* ECF No. 316 at 1042:22–25, 1046:17–25, 1047:1–11; *Russo v. Ballard Med. Prod.*, 550 F.3d 1004, 1018 (10th Cir. 2008) ("In setting damages, the jury's function is to weigh contradictory evidence, to judge the credibility of the witnesses, and to resolve factual disputes." (quotations omitted)); *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1268 (10th Cir. 2014) ("[A] jury can reduce an expert's calculations on damages even when unable to run the exact numbers and calculations of [a damages] model with mathematical certainty." (quotations omitted)). While the jury could have awarded the entire $2,857,157.78 in hard costs, it clearly found that Curtis Park had only proved $1,504,827.

---

[14] As discussed later in the Court's analysis of Allied World's Rule 50(b) motion, under the parties' Builder's Risk Policy, Curtis Park may recover for hard costs paid by its contractors and subcontractors, including Milender White.

[15] Allied World argues that "resulting losses" would not include repairs to the slab itself (ECF No. 319 at 7). Mr. McConnell's testimony clearly states that "restoration costs" are costs to "put back the framing members, to adjust the cabinets, [and] to adjust the electrical work in the ceiling" of structures *above* the slab (ECF No. 316 at 1047:9–11). This testimony is wholly consistent with Mr. Fronaphel's testimony regarding the S*Park "superstructure," which Allied World cites in its Rule 50(b) motion to demonstrate what constitutes a "resulting loss" (ECF No. 319 at 7; *see also* ECF No. 314 at 740:12–25). Simply put, Allied World identifies excerpts from the trial transcripts, in the form of Mr. Fronaphel's testimony, making clear that Mr. McConnell provided the jury with evidence of what constituted a "resulting" hard cost loss.

***Soft Costs.*** Second, the evidence shows that Curtis Park incurred nearly $1,000,000 in soft costs (*see, e.g.,* Tr. Ex. 042-001; ECF No. 313 at 278:17–18; ECF No. 316 at 1043:18–20, 1062:1–5). And assuming once again that the jury's verdict was limited to "resulting losses," Curtis Park offered sufficient evidence at trial for the jury to award "resulting loss" soft costs (*see* ECF No. 334 at 13). The Court summarizes Allied World's contrary argument and rejects it.

Allied World contends that to show its soft costs were covered under a "resulting loss" theory, Curtis Park was required to prove that delay costs resulting from the deflection were "related only to superstructure repairs" (ECF No. 319 at 7). But, Allied World's argument goes, trial evidence showed that delay costs were related to both repairing the deflection and repairing the superstructure (*id.* at 8). Therefore, the delay costs cannot be *solely* attributable to repairing the superstructure, and thus are not "resulting losses"—moreover, Curtis Park presented "no evidence" attempting to distinguish "resulting loss" soft costs and soft costs "caused by the deflection itself" (*id.*).

However, assuming that Curtis Park was required to identify soft costs solely attributable to superstructure repairs, Curtis Park identifies evidence in the trial record demonstrating that it incurred soft costs solely attributable to repairing the S*Park superstructure, and thus presented the jury with sufficient evidence to award Curtis Park "resulting loss" soft costs (ECF No. 334 at 13; *see also* ECF No. 316 at 1062:3–5).[16] For example, Mr. McConnell testified that, due to the slab's deflection, Building A1's "delay period" was 164 days (ECF No. 316 at 1073:1–7). This delay period was to "rip out the work, to do the concrete reinforcement, and put back some work"

---

[16] Curtis Park contends that it is not required to show that its "resulting losses" arose from a "separate causal agent" (ECF No. 334 at 14–15; *cf.* ECF No. 341 at 9–10). Assuming, as Allied World argues, that Curtis Park was required to produce evidence that its "resulting loss" soft costs were related solely to superstructure repairs, Curtis Park introduced sufficient evidence at trial of these soft costs (*id.* at 16; *cf.* ECF No. 341 at 9).

(ECF No. 316 at 1073:5–7). Even though "for the most" part the delay period related to this work, Mr. McConnell's testimony continued: "It doesn't include *all* the work because there's *still painting and other finish items* that went on *beyond that*" (ECF No. 316 at 1073:7–9 (emphases added)). Darren Hinton, Milender White's Senior Vice President, offered similar testimony. According to Mr. Hinton, and consistent with other trial testimony, the S*Park project "basically stopped for four and a half months" (ECF No. 313 at 492:15–16; *see also* ECF No. 316 at 1044:7–10). He continued: "[A]fter the carbon fiber was installed and we had to sign off that it was good, the green light was given, and that building would basically resume what *would have happened* back on December 21st prior to" the deflection (ECF No. 313 at 492:16–20 (emphasis added); *see also id.* at 493:11–21). Mr. Fronapfel also testified that "we have the deflection of the slab, and *then* the deformation of the super frame and the finishes above it" (ECF No. 314 at 779:1–4 (emphasis added); *see also* Tr. Ex. 030-003).

At bottom, the Court agrees with Curtis Park that the trial record contains sufficient evidence showing that it incurred losses related to performing work on the S*Park superstructure after the slab was fixed: "resulting loss" soft costs (ECF No. 334 at 13; *see also id.* at 16). *Cf., e.g., Lodge at Mountain Vill. Owner Ass'n, Inc. v. Eighteen Certain Underwriters of Lloyd's of London*, 591 F. Supp. 3d 1008, 1016 (D. Colo. 2022) (finding at summary judgment stage that construction defect was "causal agent" of damage rather than later covered peril where the plaintiff "*admitted* that the damage it claim[ed] . . . [was] the same" type resulting from faulty workmanship, including water damage; plaintiff's experts opined damage to material "resulted" from faulty construction; and plaintiff's "contrary argument [was] not supported by the evidence" (emphasis added)). For this reason, the Court need not address the remainder of Curtis Park's arguments regarding

"resulting loss" soft costs, given that the evidence is sufficient to survive Allied World's evidentiary challenge to Curtis Park's "resulting loss" soft costs.[17] *See also Liberty Mutual Fire Insurance Company*, 913 F.3d at 983; *Mountain Dudes*, 946 F.3d at 1130.

### 3. Builders' Risk Policy & Hard Costs

Allied World argues that Curtis Park cannot recover hard costs incurred by parties who were not named insureds under the Builders' Risk Policy, given that the Builders' Risk Policy's plain language limits coverage to "losses incurred by the named insured"—Curtis Park (ECF No. 319 at 10). Curtis Park contends that, because the parties' policy was a builder's risk policy, it was permitted to recover hard costs, regardless of "who paid in the first instance" ECF No 334 at 16). Fundamentally, Curtis Park's argument goes, the parties' Builders' Risk Policy was broadly designed to protect against losses to the S*Park project during construction, and does not foreclose Curtis Park's "right to recovery" of hard costs, even if certain losses incurred by the project were "paid in the first instance by someone else," such as Milender White (*id.* at 19–20).  For the reasons set forth below—and those previously provided by the Court during trial—the Builders' Risk Policy permits Curtis Park's recovery of hard costs, even those paid by other contractors or subcontractors in the first instance.

Recall that during trial, the Court—addressing the parties' same dispute as to whether Curtis Park was precluded "from seeking coverage under the policy for the hard costs that Milender

---

[17] So too with Allied World's remaining argument that Curtis Park "failed to prove it suffered any resulting loss" (ECF No. 319 at 8–10). This argument rests on the premise that the "sole basis upon which the jury decided liability" was related to Curtis Park's resulting losses (*id.*). The Court reiterates: This is wrong. The jury's verdict demonstrates that it did not reach a liability determination based solely on Curtis Park's resulting losses.  As such, the Court need go no further in addressing Allied World's argument. Nonetheless—even entertaining Allied World's argument, and for the reasons set forth above—Curtis Park provided sufficient evidence at trial that it suffered "resulting losses" (ECF No. 334 at 16).

White absorbed and/or agreed to pay related to the repair of the slab's deflection"—ruled that Curtis Park may seek coverage under the Builders' Risk Policy for these hard costs (ECF No. 313 at 404:10–22). Allied World objected (*id.* at 407:15–25).

All that's old is new again. In its Rule 50(b) motion, Allied World marshals several authorities in contending that the parties' Builders' Risk Policy does not permit Curtis Park's hard cost recovery, and distinguishes the cases upon which the Court previously relied in reaching its conclusion during trial that Curtis Park may recover these hard costs (ECF No. 319 at 12–13; *see generally* ECF No. 319-1). Nonetheless, Allied World fails to persuade that Curtis Park is prohibited from recovering hard costs that were paid in the first instance by others, such as Milender White and its subcontractors.

**_Builder's Risk Policies, Generally._** Builder's risk policies are purposeful insurance instruments. "The very purpose of a 'builder's risk policy' is to provide protection for the building under construction," and typically to insure "building materials, machinery, and equipment on the premises that are awaiting installation." *Ajax Bldg. Corp. v. Hartford Fire Ins. Co.*, 358 F.3d 795, 799 (11th Cir. 2004) (citation omitted); *see also Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 695 n.7 (Colo. 2009) (en banc) ("Builder's risk policies typically indemnify a contractor against the loss of, or damage to, a building the contractor is constructing." (citation omitted)). Coverage under a builder's risk policy "reimburses the owner, or any party with an insurable interest . . . for the accidental loss, damage, or destruction of the property." *Data Specialties, Inc. v. Transcon. Ins. Co.*, 125 F.3d 909, 914 (5th Cir. 1997) (footnote omitted); *see also One Place Condo., LLC v. Travelers Prop. Cas. Co. of Am.*, No. 11 C 2520, 2015 WL 2226202, at *3 (N.D. Ill. Apr. 22, 2015) (observing that builder's risk insurance policies cover construction projects and

insure "against accidental losses, damages or destruction of property for which the insured has an insurable interest"). A builder's risk policy "protects those who have an insurable interest in a building that is under repair, renovation, or construction." *Factory Mut. Ins. Co. v. Peri Formworks Sys., Inc.*, 223 F. Supp. 3d 1133, 1143 (D. Or. 2016) (quotations omitted). "Contractors, subcontractors, and materialmen all potentially have an [insurable] interest in a construction project." *Id.* (quotation omitted).

To be sure, several authorities cited in Allied World's Rule 50(b) motion provide support for its contention that builder's risk policies typically do not permit the recovery of losses for entities that are not named or defined as insureds under a policy (*see* ECF No. 319 at 11; ECF No. 319-1). For example, *Metric Constructors, Incorporated v. Industrial Risk Insurers*, 401 S.E.2d 126, 27–28, *aff'd*, 410 S.E.2d 392 (1991), determined that its plaintiff had "not shown itself to be an insured or beneficiary under the language of the [insurance] policy" because it was not defined as "an insured under the policy."[18] *See also Klefstad v. Am. Cent. Ins. Co.*, 207 F.2d 288, 289 (7th Cir. 1953) (concluding that plaintiff was not covered under builders' risk insurance policies where he was a "total stranger to the insurance policies issued by the defendant companies" and "not named as an insured or beneficiary"); *Mod. Builders, Inc. v. Alden-Conger Pub. Sch. Dist. #242*, No. 04-1056ADMJSM, 2005 WL 2089195, at *5 (D. Minn. Aug. 30, 2005) (observing that "there is authority from other jurisdictions that an owner has no right to pursue recovery from a contractor's builder's risk insurer when the owner was not named as an additional insured on the builder's risk policy" (citations omitted)); § 45:25. Builder's Risk Coverage, 4 Law and Prac. of

---

[18] *Contra id.* at 129 ("The policy in question is a builder's risk policy obtained for the manifest and stated purpose of protecting the owner and its builders against all risks to the properties affected by the owner's construction project. That plaintiff, an admitted subcontractor on the construction, is not named as an additional insured in the policy is immaterial.") (Phillips, J., dissenting).

Ins. Coverage Litig. § 45:25 ("Builder's risk is intended to cover the interests of all parties involved in the construction process to the extent they are listed as insureds under the policy.").

But these cases do not categorically foreclose Curtis Park's ability to recover hard costs under this *particular* Builders' Risk Policy (*cf.* ECF No. 319 at 11). *See United States v. Am. Home Assurance Co.*, No. 94 CIV. 7621 (LMM), 2003 WL 21436219, at *7 (S.D.N.Y. June 19, 2003) ("Resort must be had to the terms of the policy to determine who is covered and the extent of coverage." (quotations omitted)). Instead, the Court must look to the nature and terms of the parties' Builder's Risk Policy to determine whether Curtis Park may recover the hard costs at issue. *See id.*; *see also Fireman's Fund v. Structural Sys. Tech., Inc.*, 426 F. Supp. 2d 1009, 1025 (D. Neb. 2006) ("A building contractor who contracts to construct a building has an insurable interest in the building during the course of construction, as does the owner, and both interests can be insured in the same policy." (citation omitted)).[19]

***The Parties' Builders' Risk Policy.*** Undoubtedly, Curtis Park is the only "named insured" under the Builders' Risk Policy (*see, e.g.,* Tr. Ex. 016-001; ECF No. 319 at 14). And the Builders' Risk Policy states that Allied World does not cover more than "[Curtis Park's] insurable interest in any property" (Tr. Ex. 016-056).[20] However, the Builders' Risk Policy covers "direct physical

---

[19] Notably, Mr. Aviles testified that "when you write a builder's risk policy you anticipate *and expect* that *the contractors and their subcontractors* have the ability to do the work properly" (ECF No. 317 at 1208:21–23 (emphases added)).

[20] Allied World interprets this provision to mean that the Builders' Risk Policy covers only Curtis Park's insurable interest in the S*Park project (ECF No. 319 at 14). This argument acknowledges that the Builders' Risk Policy's "Insurable Interest" provision is a limitation on Allied World's *coverage* under the policy—not one that excludes other entities, such as Curtis Park's contractors and subcontractors, from *having* an insurable interest in the S*Park project (*see, e.g.,* ECF No. 314 at 614:6–12). *See also Factory Mutual Insurance Company*, 223 F. Supp. 3d at 1143 ("Contractors, subcontractors, and materialmen all potentially have an [insurable] interest in a construction project." (quotation omitted)); *Copper Mountain*, 208 P.3d at 695 n.7; *Data Specialties*, 125 F.3d at 914. *Cf. Zurich Am. Ins. Co. v. Keating Bldg. Corp.*, 513 F. Supp. 2d 55, 69 (D.N.J. 2007) ("Because [the insurer] knew how to (but did not) issue a [builder's risk] policy with . . . limiting language, the Court cannot now limit the language in the [p]olicy in

loss[es] or damages . . . to '*buildings or structures*'" in the course of their construction (Tr. Ex. 016-041 (emphasis added)). *See also Ajax Building Corporation*, 358 F.3d at 799. The Builders' Risk Policy elsewhere defines its covered costs and expenses. For instance, "[r]eplacement cost[s]" include "the necessary and reasonable costs of materials and labor incurred to repair or replace . . . the part of the covered property that sustains direct physical loss or damage" (Tr. Ex. 016-055). *See also* ECF No. 334 at 17 n.4.

Under the "close out" agreement between Milender White and Curtis Park, Curtis Park sought to recover all costs incurred resulting from the slab's deflection—"including those that Milender White paid out of pocket in the first instance"—and Milender White's payment of approximately $2,800,000 in hard costs did not preclude Curtis Park from seeking coverage under the Builders' Risk Policy for those hard costs (ECF No. 304 at 6; *see also* ECF No. 334-6 at 5:17–25, 334-6 at 6:1–6). Thus, reading the Builders' Risk Policy in its entirety, *see Copper Mountain*, 208 P.3d at 697, Curtis Park may clearly recover hard costs—even if it did not pay them in the first instance—because Curtis Park incurred them, and the Builders' Risk Policy covers "reasonable costs of materials and labor *incurred* to repair or replace" (*see, e.g.,* ECF No. 334 at 18; ECF No. 313 at 410:1–9; Tr. Ex. 016-055 (emphasis added)).[21]

---

such a way."). Mr. Aviles' own testimony is inconsistent with the notion that the Builders' Risk Policy excludes contractors and subcontractors from having an insurable interest in a covered property, such as the S*Park project (*see* ECF No. 317 at 1208:21–23).

[21] Although contemplated in the context of post-petition income taxes incurred during Chapter 12 bankruptcy proceedings and the statutory language of 11 U.S.C. § 503, the Tenth Circuit's definition of "incurred" is instructive, and bolsters the Court's conclusion that Curtis Park "incurred" hard costs that it may recover under the Builders' Risk Policy, even if Milender White paid the hard costs in the first instance. "Happily, that critical term has a definition that is as well-settled as it is precise. Black's Law Dictionary tells us that to 'incur' means to 'suffer or bring on oneself,' as in a 'liability or expense.' Webster's says the same thing, and adds the alternate definition '[to] become liable or subject to' . . . . While at the margin there might be some distinctions between these definitions, they don't leave any room for debate on this proposition: one who has 'incurred' an expense is liable for it." *In re Dawes*, 652 F.3d 1236, 1239 (10th Cir. 2011) (citations omitted).

Allied World argues that allowing Curtis Park to recover hard costs would "impermissibly"
write out other provisions in the Builders' Risk Policy (ECF No. 319 at 15). Nonsense. Curtis Park
does not seek to unilaterally rewrite the Builders' Risk Policy to include Milender White, All
Phase, or Harris Rebar as named insureds, or to erase other provisions from the Builders' Risk
Policy in order to recover its hard costs (*see, e.g.,* ECF No. 334 at 20). Nor is this a situation where
Curtis Park suggests the Builders' Risk Policy "*automatically* provides coverage for a contractor."
*U.S. Fid. & Guar. Co. v. Royal Ins. Co. of Am.*, No. 91 C 4112, 1992 WL 59113, at *3 (N.D. Ill.
Mar. 13, 1992) (emphasis added). The Builders' Risk Policy covers the S*Park project (*see* Tr.
Ex. 016-041). *See also Ajax Building Corporation*, 358 F.3d at 799; *Great Am. Ins. Co. v. Jefferson
Cnty. Comm'n*, 776 F. Supp. 2d 1252, 1264 (N.D. Ala. 2010) ("A 'builder's risk' policy like the
one at issue here is designed to insure a structure during the course of construction." (quotations
omitted)). Curtis Park's contractors and subcontractors have insurable interests in the S*Park
project (*see, e.g.,* ECF No. 314 at 614:6–12; *see also* ECF No. 317 at 1208:21–23). *See also
Factory Mutual Insurance Company*, 223 F. Supp. 3d at 1143; *Copper Mountain*, 208 P.3d at 695
n.7; *Data Specialties*, 125 F.3d at 914. Curtis Park, as the named insured, simply seeks to recover
hard costs incurred to the S*Park's "'buildings or structures' while in the course of construction"
by its contractors and subcontractors (*see id*; Tr. Ex. 016-055–56). Therefore, by its plain language,
the Builders' Risk Policy permits Curtis Park's hard costs recovery (*id.*). *See Copper Mountain*,
208 P.3d at 697; *cf. Zurich American Insurance Company*, 513 F. Supp. 2d at 69 ("Because [the

insurer] knew how to (but did not) issue a [builder's risk] policy with . . . limiting language, the Court cannot now limit the language in the [p]olicy in such a way.").[22]

**_The "Close-Out" Agreement & Scope of Coverage._** Allied World contends that its obligations under the Builders' Risk Policy cannot be "expanded" through Curtis Park's "close-out" agreement with Milender White (ECF No. 319 at 15; *see also id.* at 10).[23] The Court agrees with Curtis Park: it is not seeking to "expand to the scope of coverage" under the Builders' Risk Policy (ECF No. 334 at 20). As discussed above, Curtis Park is simply seeking to enforce the terms of the parties' Builders' Risk Policy, which provides coverage for losses that include, for instance, materials and labor to "repair and or replace . . . the part of the covered property"—S*Park—"that sustains direct physical loss or damage" (Tr. Ex. 016-055). *See also* ECF No. 334 at 17 n.4. Accordingly, the Court rejects Allied World's argument that permitting Curtis Park to recover hard

---

[22] Allied World argues that permitting Curtis Park to recover Milender White and its subcontractors' hard costs would also "destroy" Allied World's "right to seek subrogation" (ECF No. 319 at 15 n.3). Under the Builders' Risk Policy's "Subrogation" provision, Allied World "may require [Curtis Park] to assign [it] the right of recovery against others" if Allied World "pay[s] for a loss" (Tr. Ex. 016-059). The Court agrees with Curtis Park that permitting Curtis Park to recover hard costs does not "defeat" or "destroy" Allied World's subrogation rights under the Builders' Risk Policy, given that, as discussed above, the hard costs Curtis Park seeks to recover were losses incurred by the S*Park project were insured under the Builders' Risk Policy (ECF No. 334 at 19). *See also Ajax Building Corporation,* 358 F.3d at 799; *Great American Insurance Company,* 776 F. Supp. 2d at 1264. *Cf. Tri-State Ins. Co. of Minnesota v. Com. Grp. W., LLC,* 698 N.W.2d 483, 490 (N.D. 2005) (declining in distinguishable factual context to extend "antisubrogation rule to imply that unnamed subcontractors are included under a builder's risk policy issued to the owner of the property" while emphasizing distinctions in other cases' contractual language in reaching this conclusion).

[23] Allied World further argues that Milender White admitted for the first time at trial that it "did not pay its subcontractors over $1 million to account for the losses it incurred" (ECF No. 319 at 16). The Court heard argument on this factual issue during trial, and ultimately ruled that the "additional information" gathered from Milender White at trial did not change its prior ruling: "Curtis Park is the insured, [and that] the [Builders' Risk Policy] under Colorado law protects those who have an insurable interest in the building under repair or construction" (ECF No. 314 at 614:6–12). However, recognizing Allied World's "concern about a potential double recovery," the Court permitted Allied World to ask a "limited inquiry" into whether Milender White entered into agreements with subcontractors, Milender White's conversations with subcontractors "about who's at fault," and probe any bias and interest Milender White had in this litigation (ECF No. 314 at 614:13–16, 615:1–10). The Court ultimately concluded that, based on the testimony Allied World identifies in its Rule 50(b) motion, it did not see "a double recovery coming" (ECF No. 314 at 614:14).

costs would expand coverage "beyond what was agreed" to under the Builders' Risk Policy (ECF No. 319 at 16).[24]

\* \* \*

In ruling on Allied World's Rule 50(b) motion, the Court's task is narrow: to determine, without challenging the jury's factual conclusions or making credibility determinations, whether Allied World has shown that the evidence "points but *one way* and is susceptible to *no reasonable inferences* which may support the nonmoving party's position." *Mountain Dudes*, 946 F.3d at 1129 (emphases added); *see also Liberty Mutual Fire Insurance Company*, 913 F.3d at 983. Nor may the Court "speculate as to the manner by which jurors arrived at the verdict" and damages award. *Questar Pipeline Co. v. Grynberg*, 201 F.3d 1277, 1289 (10th Cir. 2000) (citation omitted); *see also id.* (concluding that judgment as a matter of law or new trial was not appropriate where jury award was "within the range of evidence"). Allied World has failed to show that the evidence points singularly and conclusively toward judgment as a matter of law in its favor. *See Mountain Dudes*, 946 F.3d at 1130; *Stroup v. United Airlines, Inc*., 26 F.4th 1147, 1157 (10th Cir. 2022) ("[T]he mere existence of contrary evidence does not itself undermine the jury's findings as long as sufficient other evidence supports the findings." (quotations omitted)). Accordingly, the Court denies Allied World's Renewed Motion for Judgment as a Matter of Law Under Federal Rule of Civil Procedure 50(b) (ECF No. 319).

---

[24] The "close-out" agreement released Curtis Park and Milender White from liability for any legal claims they may have had against each other (ECF No. 304 at 6). Curtis Park, save for its "close-out" agreement with Milender White, would have been responsible for the hard costs incurred to the S\*Park project within the course of its construction, even if Milender White paid them in the first instance. Essentially, the "close-out" agreement resolved disputes between Curtis Park and Milender White, whereas Curtis Park was separately responsible for—and able to recover—S\*Park's hard costs (ECF No. 313 at 410:1–9).

**B. Allied World's Motion for New Trial Under Federal Rule of Civil Procedure 59(a)**

In its Rule 59(a) motion, Allied World contends that the jury's verdict was inconsistent and an impermissible compromise, that the jury was incorrectly instructed on the "hard costs" issue, and that Curtis Park and Milender White concealed "crucial information" that resulted in unfair surprise during trial (*see generally* ECF No. 320). These arguments lack merit.

### 1. Legal Standard

Following a jury trial, a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "In ruling on a motion for a new trial, the trial judge has broad discretion." *McHargue v. Stokes Div. of Pennwalt Corp.*, 912 F.2d 394, 396 (10th Cir. 1990) (citation omitted). A motion for a new trial is "generally not regarded with favor," and is "granted only with great caution." *Nosewicz v. Janosko*, 857 F. App'x 465, 468 (10th Cir. 2021) (citing *United States v. Perea*, 458 F.2d 535, 536 (10th Cir. 1972)). It is inappropriate to grant a new trial "unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Id.* (citing 11 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2803); *see also Burke v. Regalado*, 935 F.3d 960, 1026 (10th Cir. 2019) (noting that a district court abuses its discretion in Rule 59(a) context "if it [makes] a clear error of judgment or exceede[s] the bounds of permissible choice in the circumstances." (quotation omitted)).

### 2. Consistency of Jury Verdict

Allied World argues that the jury's verdict was inconsistent and "logically incompatible," and therefore "cannot be the basis for judgment" (ECF No. 320 at 5). Curtis Park contends that

there is no irreconcilable inconsistency in the jury's verdict justifying a new trial (ECF No. 335 at 6). The Court agrees with Curtis Park.

*Legal Standard.* Determining whether a jury's verdict was "inconsistent [is] not done lightly." *Johnson v. Ablt Trucking Co.*, 412 F.3d 1138, 1143 (10th Cir. 2005). To protect the jury's function, courts must "reconcile the jury's findings, by exegesis if necessary" before they are "free to disregard" a jury's special verdict and order a new trial." *Id.* (citing *Gallick v. Baltimore & Ohio R. Co.*, 372 U.S. 108, 119 (1963)). Courts must accept "any reasonable explanation that reconciles" a jury's verdict in determining whether the verdict is inconsistent. *Domann v. Vigil*, 261 F.3d 980, 983 (10th Cir. 2001) (citations omitted); *see also Fox v. Hayes*, 600 F.3d 819, 844 (7th Cir. 2010) ("Any plausible explanation for the verdict precludes reversal." (citation omitted)); *Johnson*, 412 F.3d at 1144. A jury's verdict is "irreconcilably inconsistent" where its answers are "logically incompatible, thereby indicating that the jury was confused or abused its power." *Johnson*, 412 F.3d at 1144 (quotations omitted). Courts consider jury instructions in assessing the consistency of a jury's verdict. *See Loughridge v. Chiles Power Supply Co.*, 431 F.3d 1268, 1275 (10th Cir. 2005). Movants under Rule 59 bear the burden of showing that any verdict inconsistency demonstrates that the jury was confused or abused its power. *Domann*, 261 F.3d at 983 (citations omitted).

*Analysis.* Allied World's argument is easily understood: It is inconsistent and "logically incompatible" for the jury to have considered the applicability of the "resulting loss" exception to the "Defects, Errors, and Omissions" exclusion—and find that the exception applies—after finding that the exclusion does *not* apply (ECF No. 320 at 6; *see also* ECF No. 342 at 4). However, the jury's answers do not reveal a logical incompatibility that warrants a new trial. *See Johnson*, 412

F.3d at 1144. The jury's answer to Question No. 3 on the Verdict Forms regarding the applicability of the "resulting loss" exception was surplusage—given the jury determined that the "Defects, Errors, and Omissions" exclusion did not apply—and the jury's answer did not alter its finding that Allied World was liable for the breach of its insurance contract with Curtis Park (ECF No. 308 at 1; *see also* ECF No. 335 at 8–9). *See White v. Grinfas*, 809 F.2d 1157, 1161 (5th Cir. 1987) ("[I]f . . . the jury's answer to a question that was supposed to terminate further inquiry is clear and disposes of the legal issues, on review we must ignore the jury's necessarily conflicting answers to any other questions."); *Carr v. Wal-Mart Stores, Inc.*, 312 F.3d 667, 674 (5th Cir. 2002) ("[A] district court does not abuse its discretion in reconciling verdicts containing answers to interrogatories that the jury was instructed not to answer, when it [ ] disregards the superfluous answers in their entirety . . . . (citations omitted)); *Floyd v. L.*, 929 F.2d 1390, 1398 (9th Cir. 1991) (concluding that district court did not abuse its discretion by "ignoring the answer to question 14" on special verdict form as "surplusage" where the court "expressly stated on the special verdict form that the jury should not proceed to question 14 if it answered 'No' to question 13"); *Romero v. Helmerich & Payne Int'l Drilling Co.*, 768 F. App'x 838, 845 (10th Cir. 2019) ("Some failures to follow the jury instructions differ from logically contradictory verdicts . . . . Failing to follow the court's instructions may create only superfluous information, not a logical contradiction." (quotations omitted)).[25] Although the jury answered Question No. 3 superfluously, its answers

---

[25] *Romero* is instructive. In *Romero*, the jury found both that the plaintiff "was actually discharged and that he was constructively discharged." 768 F. App'x at 844. The Tenth Circuit concluded that this verdict was not "irreconcilably consistent" on the grounds that the jury "could have concluded that actual discharge and constructive discharge, though different, overlap." *Id.* Noting that the jury's finding of actual discharge rendered its further finding of constructive discharge "unnecessary," the Tenth Circuit affirmed the district court's conclusion that "even if the jury's special verdict [was] legally inconsistent with the theories advanced at trial" it was still "logically consistent in its determination that [the plaintiff] was discharged in violation of public policy." *Id.* at 845; *see also id.* ("Because there are plausible interpretations that logically reconcile the jury verdict, the district court did not abuse its discretion in

regarding Allied World's ultimate breach of the parties' insurance contract are reconcilable and logically consistent (ECF No. 304 at 1). *See also Romero*, 768 F. App'x at 845; *Johnson*, 412 F.3d at 1143; *Carr*, 312 F.3d at 674. Therefore, Allied World has failed to show that the Court should disregard the jury's verdict and finding that the "Defects, Errors, and Omissions" exclusion did not apply. *See Domann*, 261 F.3d at 983.[26]

Allied World cites several authorities in support of its contention that a new trial is warranted based on the jury's finding regarding the "resulting loss" exception (*see, e.g.* ECF No. 320 at 6). None persuade. For instance, the Tenth Circuit has concluded that a jury's verdict was "irreconcilably conflicting" where the jury found "for both parties." *Danner v. Int'l Med. Mktg., Inc.*, 944 F.2d 791, 794 (10th Cir. 1991). In *Cheney v. Moler*, 285 F.2d 116, 117 (10th Cir. 1960), a jury returned two verdicts: one in favor of the plaintiff and against the defendant on the defendant's counterclaim, and the other in favor of the plaintiff on the plaintiff's claim—however, the jury "specifically assessed no damages for the plaintiff." The Tenth Circuit concluded that a "re-trial of the case" was required because the jurors' failure to award the plaintiff any damages after finding in his favor reflected a "lack of understanding [regarding] their duty to assess damages if a determination of liability was intended." *Id.* at 118. *Danner* and *Cheney* are readily distinguished. Unlike *Danner*, the jury did not find for both Allied World and Curtis Park on Curtis Park's breach of contract claim. *Cf.* 944 F.2d at 794; *Harvey By & Through Harvey v. Gen. Motors*

---

denying [the defendant's] motion for a new trial."). So too here. Even if the jury's findings regarding the "Defects, Errors, and Omissions" exclusion and the "resulting loss" exception are "legally inconsistent" with some of the parties' trial theories, these findings are "logically consistent" with the jury's determination that Allied World breached the parties' insurance policy and that Curtis Park may recover under the policy. *Id.* And for these reasons, this is not a case where the Court is improperly "obviating" any factual finding made by the jury (ECF No. 342 at 5).

[26] As indicated in the Court's Rule 50(b) analysis, for this reason the jury's damages award was not *limited* to Curtis Park's "resulting loss" damages.

*Corp.*, 873 F.2d 1343, 1350 (10th Cir. 1989) ("[If two *causes of action* are of such a nature that recovery can be had only as to one, verdicts in favor of a *plaintiff and against the defendants* on both causes of action are inconsistent." (quotations omitted)). *Cheney* does not present "functionally identical circumstances" because the jury clearly awarded Curtis Park damages after finding that Allied World was liable for its breach of the parties' insurance policy (ECF No. 320 at 7). *See also* 285 F.2d at 118. Nor—in reaching its conclusion regarding the logical consistency jury's verdict on Curtis Park's claim—is the Court "disregard[ing] the jury's answers" to other questions on the Verdict Forms or treating them as "general verdicts." *Bonin v. Tour W., Inc.*, 896 F.2d 1260, 1263 (10th Cir. 1990); *cf. also Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 852 (10th Cir. 2000) (concluding that jury could not "reconcilably find" in discrimination action that a corporate employee "did not discriminate but [the corporation] did").

Hunting for inconsistencies, Allied World looks elsewhere in the jury's verdict: the amount of its damages award (ECF No. 320 at 8; ECF No. 342 at 4). According to Allied World, the jury's decision to award "only resulting losses"—damages under the "resulting loss" exception—after finding that the "Defects, Errors, and Omissions" exclusion did not apply evinces the inconsistency of its verdict (ECF No. 320 at 8; *see also id.* at 6). The Court disagrees with Allied World that the jury's damages award provides a basis for ordering a new trial.[27] It is wholly plausible that the jury, after finding the "Defects, Errors, and Omissions" exclusion did not apply, concluded that Curtis Park only proved that it was entitled to its "resulting loss" damages, and not the full extent of its hard costs (ECF No. 335 at 9–10). *See also Domann*, 261 F.3d at 983; *Fox*, 600 F.3d at 844

---

[27] Allied World argues that the jury's award of "less than the full amount of damages" was not "supported by the evidence" (ECF No. 320 at 7). As discussed above in its analysis of Allied World's Rule 50(b) motion, the Court disagrees.

("Any plausible explanation for the verdict precludes reversal." (citation omitted)). As discussed above in the Court's analysis of Allied World's Rule 50(b) motion, the jury is entitled to award damages—as it did here—within the range of evidence presented at trial (*see* ECF No. 335 at 10). *See also Russo*, 550 F.3d at 1018 ("In setting damages, the jury's function is to weigh contradictory evidence, to judge the credibility of the witnesses, and to resolve factual disputes." (quotations omitted)); *In re Urethane Antitrust Litig.*, 768 F.3d at 1268; *To-Am Equip. Co. v. Mitsubishi Caterpillar Forklift Am., Inc.*, 152 F.3d 658, 665 (7th Cir. 1998) (concluding that district court did not abuse its discretion in declining to order new trial or remittitur where jury's damages award "easily fell within the range of valuation testimony presented" (citations omitted)). At bottom, it is not "impossible to square" the jury's damages award with its liability finding on Curtis Park's breach of contract claim, or its determination that the "Defects, Errors, and Omissions" exclusion did not apply, and accepting Allied World's invitation to overturn the jury's verdict on this basis is improper. *Johnson*, 412 F.3d at 1144.[28]

Finally, Curtis Park argues that a new trial is inappropriate because any error in the jury's verdict is harmless (*see* ECF No. 335 at 11). The Court agrees. Even though the jury answered each question regarding the "Defects, Errors, and Omissions" exclusion and the "resulting loss" exception, the jury found in Curtis Park's favor on its breach of contract claim (ECF No. 308 at

---

[28] Arguing otherwise, Allied World cites distinguishable authorities lacking persuasive force (ECF No. 342 at 4–5). *See Custer v. Terex Corp.*, 196 F. App'x 733, 737–38 (11th Cir. 2006) (concluding district court did not err after determining that jury verdict was "internally inconsistent" when jury "implicitly found" that defendant was 30% at fault and plaintiff 70% at fault, resulting in "an award of damages for medical expenses and funeral costs at a rate of 30 percent of the stipulated amount," but jury also found that defendant was "more than 50 percent at fault under Georgia comparative negligence law"); *F & H Inv. Co. v. Sackman-Gilliland Corp.*, 728 F.2d 1050, 1053 (8th Cir. 1984) ("Given the court's instruction that the jury was *to ignore anything* involving [a non-party] in determining damages, the jury's award of damages is inconsistent with its finding that plaintiff's *only* reliance on defendant's misrepresentations was in breaking its loan commitment with [the non-party]." (emphases added)). The circumstances making the verdicts wholly contradictory in *Custer* and *Sackman-Gilliland* are absent here.

1). *See Briggs v. Temple Univ.*, 339 F. Supp. 3d 466, 502 n.8 (E.D. Pa. 2018) (concluding that "even though the jury ignored the verdict sheet instruction" this was a "harmless error that [did] not warrant a new trial" (citations omitted)). Thus, even if the jury erred in answering Question No. 3 on the Verdict Forms regarding the "resulting loss" exception, this did not prejudice Allied World, given the jury's liability finding, and Allied World has failed to show that this necessitates the case's retrial (ECF No. 308 at 1; ECF No. 342 at 6). *Briggs*, 339 F. Supp. 3d at 502 n.8 ("Trial errors are considered harmless when it is highly probable that the error did not affect the outcome of the case." (citation omitted)); § 2803 Power and Discretion of Court, 11 Fed. Prac. & Proc. Civ. § 2803 (3d ed.) ("[T]he burden of showing *harmful error* rests on the party seeking the new trial." (footnote omitted) (emphasis added)); *Nosewicz*, 857 F. App'x at 468.[29]

\* \* \*

The Court is charged with protecting the jury's function and reconciling its findings before ordering a new trial. *Johnson*, 412 F.3d at 1143. Allied World bears the burden of showing that the jury's verdict was irreconcilably inconsistent and that the Court, on this basis, should reverse the verdict and order a new trial. *See Johnson*, 412 F.3d at 1143; *Domann*, 261 F.3d at 983. For the reasons set forth above, it has failed to carry this burden. *See Fox*, 600 F.3d at 844; *Johnson*, 412 F.3d at 1144.

### 3. Verdict & Compromise

Allied World argues that "retrial is separately required" because the jury reached an impermissible compromise (ECF No. 320 at 8). Curtis Park contends that the jury's verdict bears

---

[29] Regarding Curtis Park's statutory bad faith claim, Allied World has not challenged the jury's finding regarding Allied World's liability.

no indicia of an impermissible compromise (ECF No. 335 at 11). The Court agrees with Curtis Park.

*Legal Standard.* A "compromise verdict" is one in which "the jury, unable to agree on liability, compromises that disagreement and enters a low award of damages." *Shugart v. Cent. Rural Elec. Co-op.*, 110 F.3d 1501, 1505 (10th Cir. 1997) (citing *National R.R. Passenger Corp. v. Koch Indus., Inc.*, 701 F.2d 108, 110 (10th Cir.1983)). Indicia of a compromise verdict include: "close questions" of liability; a "grossly inadequate" damages award; and "other circumstances such as [the] length of jury deliberation." *Id.* (citing *National R.R. Passenger Corporation*, 701 F.2d at 110)). The record "viewed in its entirety must clearly demonstrate" that the verdict was compromised. *Id.* at 1506 n.7 (quotations omitted).

*Analysis.* First, regarding the "close question" of liability, Allied World contends that the jury's award of "resulting loss" damages—despite finding that the "Defects, Errors, and Omissions" exclusion did not apply—coupled with its "split verdict" on the common law and statutory bad faith claims, weighs this compromise factor in its favor (ECF No. 320 at 9). The Court disagrees. The jury's verdict on Curtis Park's bad faith claims does not bear the hallmark of a compromised verdict because it was not impermissibly "split" (ECF No. 335 at 12). Although the jury did not find in Curtis Park's favor on the common law insurance bad faith claim, the jury's findings consistently found Allied World as the singularly liable party in its verdict (*id.*). *Cf. Cassady v. Goering*, No. CIVA 03-cv-01008 WDM-PAC, 2007 WL 549839, at *1, 4 (D. Colo. Feb. 16, 2007), *aff'd on other grounds*, 567 F.3d 628 (10th Cir. 2009) (finding verdict was split in concluding that jury reached compromise verdict where jury found in favor of defendant and plaintiffs on various claims); *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1287 (11th Cir.

2008) (concluding that jury's "split verdict" on plaintiff's various discrimination claims reflected "reasoned conclusion") (citation omitted)).[30] And—by now, exhaustively discussed—the jury's verdict regarding Curtis Park's breach of contract claim and attendant damages award does not counsel retrying this case.[31]

Second, regarding the "gross inadequacy" of the jury's damages award, Allied World argues that the jury's damages award "does not match" its liability findings (ECF No. 320 at 9; ECF No. 342 at 8). The Court has rejected this refrain and does so again. The finding that the "Defects, Errors, and Omissions" exclusion did not apply, coupled with the jury's damages award, provide no support for Allied World's argument that its verdict is compromised. The jury performed its function in awarding Curtis Park's damages in its chosen amount, and Allied World fails to persuade that the jury's performance of that function, when viewing the entire record, demands retrial. *Shugart*, 110 F.3d at 1506 n.7; *id.* at 1506 ("Damages are not grossly inadequate merely because a jury awards less than the plaintiff has requested. The jury is entitled to disregard the damages asked for if they do not agree with the computations or if other evidence is introduced from which jurors could draw their own conclusions." (quotations omitted)); *see also Russo*, 550

---

[30] Notably, the jury also found that Allied World failed to prove its affirmative defense under the "Misrepresentation, Concealment, or Fraud" clause, underscoring that its verdict was not "split," and the question of liability was not "close" (ECF No. 308 at 1).

[31] Allied World identifies the Court's comment during trial that it was a "close call in terms of what exactly [was] *claimed* under the resulting loss" (ECF No. 317 at 1480:3–5 (emphasis added)). The Court's comment regarding damages claims under the "resulting loss" exception bears not on whether there is a "close call" on Allied World's liability for Curtis Park's breach of contract claim. *See National R.R. Passenger Corporation*, 701 F.2d at 110 ("To determine whether a verdict is a compromise verdict, a court looks for *a close question of liability*." (emphasis added)).

F.3d at 1018.[32] The fact that the jury asked a clarifying question during deliberations does not disturb this conclusion (ECF No. 320 at 9).

Third, regarding the "length of jury deliberation," the Court disagrees with Allied World that the jury "rushed to return a verdict," and that for this reason its verdict was compromised (ECF No. 320 at 9). The jury deliberated for several hours (ECF No. 318 at 1572–74). The length of the jury's deliberations does not evoke *Cassady*, where the jury returned a suggestively compromised verdict at the "very last minute of the court's deadline" on a Friday to "be done by the weekend" with jury service. 2007 WL 549839, at *4. *Cf. Bavlsik v. Gen. Motors, LLC*, 870 F.3d 800, 811 (8th Cir. 2017) (finding that jury deliberated for "only four hours, a reasonable (if not short) length of time for a complex eleven-day trial" and that the "length of deliberation" factor raised "the possibility the jurors compromised but it does not compel such a conclusion" (citations omitted)); *Helena v. City of San Francisco*, No. C04-0260 CW, 2006 WL 1140953, at *7 (N.D. Cal. May 1, 2006) ("[T]he speed with which the jury delivered the verdict indicates that the jury decided the liability issues easily, *without compromise*." (emphasis added)). Nor does Allied World supply any authority to support its argument that a single juror's demeanor or its own decision to rest when it did warrant retrial (ECF No. 320 at 9). Thus, the "length of deliberation" factor weighs against a compromise finding. Regardless, where the first two compromise factors—whether liability was a "close call" and whether the damages award was "grossly inadequate"—weigh heavily against

---

[32] On this point, Allied World's authorities are distinguishable, given particularly that the parties challenged Curtis Park's claimed damages and whether they were covered under the Builders' Risk Policy (ECF No. 320 at 9; *see also* ECF No. 316 at 1092:19–25, 1093:1–2). *See Devine v. Patteson*, 242 F.2d 828, 832 (6th Cir. 1957) ("While there was controversy as to defendant's liability, there was no controversy as to the necessity of plaintiff's incurring the expenses listed, nor as to the fact that they were actually incurred."); *Cassady*, 2007 WL 549839, at *4 (concluding that damages award "appear[ed] inadequate" where jury awarded $6,500 damages in total despite "fairly extensive damage" to facilities). *Cf. Kinsella v. Leonard*, 415 F.2d 574, 577 (10th Cir. 1969).

retrial, Allied World has failed to meet its burden of showing that the jury's verdict was an impermissible compromise. In sum, Allied World has failed to show that, reading the record in its entirety and considering the relevant factors, that it is clear the jury returned a compromise verdict. *See Shugart*, 110 F.3d at 1505, 1506 n.7.

### 4.   Jury Instruction on Hard-Cost Issues

Allied World argues that the jury was "incorrectly instructed" on the "hard costs" issue (ECF No. 320 at 10). Curtis Park observes this argument's familiarity: Essentially, the jury was incorrectly instructed that, under the Builders' Risk Policy, Curtis Park could recover hard costs paid by others in the first instance (ECF No. 335 at 16).

In its discussion of Allied World's Rule 50(b) motion, the Court concluded—consistent with its rulings throughout trial—that Curtis Park could recover the hard costs paid in the first instance by other contractors and subcontractors, including Milender White. In the context of its Rule 59 motion, Allied World has failed to show that—given Curtis Park's ability to recover these costs under the Builders' Risk Policy—the Court erred in giving the jury an instruction to this effect (ECF No. 320 at 10). *Cf. Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1158 (10th Cir. 2008) (observing that verdict reversal is appropriate only if jury "might have based its verdict" on a "legally erroneous jury instruction" (quotations omitted)); *Advanced Recovery Sys. v. Am. Agencies*, 923 F.3d 819, 827 (10th Cir. 2019) (making same observation and noting that "[s]uch a possibility doesn't always exist").

Accordingly, and for the reasons set forth above in its Rule 50(b) analysis, the Court rejects Allied World's arguments regarding Curtis Park's hard cost recovery and the alleged errors in the Court's jury instructions. *See Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1424 (10th Cir.

1993) (stating that when assessing allegedly erroneous jury instructions courts examine "the record as a whole to determine whether the instructions state the applicable law and provide the jury with an appropriate understanding of the issues and the legal standards to apply" (citation omitted)). Nor, for this reason and those detailed above, did the Court's jury instructions prevent Allied World from presenting a full defense, given that the Court's jury instructions provided the jury with the applicable law and legal standards (ECF No. 320 at 11). *See Faulkner*, 3 F.3d at 1424; *cf. Brodie v. Gen. Chem. Corp.*, 112 F.3d 440, 444 (10th Cir. 1997) (concluding jury instruction was erroneous and misled jury where it "clear[ly] . . . was an incorrect statement of Wyoming law"); *Est. of Grubbs v. Hernandez*, No. 18-1358, 2021 WL 4239021, at *8 (10th Cir. Sept. 17, 2021) (emphasizing that "the case law is clear . . . as the [jury] instruction" explained, and concluding that instruction was "not misleading to the jury" nor that the district court "err[ed] when it provided" the jury instruction" (citations omitted)).

### 5. *Unfair Surprise*

Finally, Allied World argues that a new trial is warranted on the grounds that Curtis Park and Milender White concealed "crucial information" about their claimed losses, resulting in an irremediable "unfair surprise" at trial (ECF No. 320 at 12). Curtis Park contends that there is no basis for ordering a new trial "on the grounds of unfair surprise" (ECF No. 335 at 17). The Court agrees with Curtis Park.

"When a party requests a new trial on the basis of surprise testimony [at trial] it must be able to show surprise, prejudice, and an attempt to cure the prejudice such as a motion for a continuance." *Marino v. Otis Eng'g Corp.*, 839 F.2d 1404, 1411 (10th Cir.1988) (citing *Hynes v. Energy W., Inc.*, 211 F.3d 1193, 1203 (10th Cir. 2000)). A party seeking a new trial must satisfy

all three elements. *See Breen v. Pruter*, No. 14-CV-081-F, 2015 WL 11051024, at *4 (D. Wyo. Nov. 24, 2015), *aff'd*, 679 F. App'x 713 (10th Cir. 2017); *Senters v. Black & Decker (U.S.), Inc.*, 123 F. App'x 354, 359 (10th Cir. 2005).

The Court first addresses the "attempt to cure" element. Allied World argues that, after learning mid-trial that Milender White "admitted it had not incurred $1.1 million in damages," it attempted to cure this surprise by asking the Court to rule that Curtis Park "could not recover the amount of money Milender White withheld from All Phase" (ECF No. 320 at 12, 16). Further, Allied World argues, it attempted to "cure the prejudice" by seeking permission to ask Mr. Hinton about this issue (ECF No. 320 at 16). Following its cross-examination of Mr. Hinton, Allied World contends that its continued objections to Curtis Park's ability to recover Milender White's losses were "sufficient to preserve its right to a retrial" (*id.* at 16–17; *see also* ECF No. 342 at 12). Curtis Park contends that Allied World's curative efforts were insufficient (ECF No. 335 at 21). The Court agrees.

Even assuming the information that Allied World identifies was surprising—which the Court has discussed above, and about which it heard argument during trial—Allied World's curative efforts were insufficient to justify retrial (*see, e.g.*, ECF No. 314 at 614:6–16, 615:1–7). Allied World identifies those efforts: raising objections and seeking permission from the Court to "explore" this information with a witness (ECF No. 320 at 16; *see, e.g.,* ECF No. 314 at 614:15–23; ECF No. 315 at 816:18–22). The Court permitted Allied World to inquire whether Milender White "entered into agreements with subcontractors about the total amounts due" (ECF No. 314 at 614:16–17). To the extent the Court limited this inquiry, it did so on confidentiality grounds, prohibiting Allied World from asking about the "amounts [because] clearly that's a confidential

negotiation" (*id.* at 614:19). Otherwise, the Court ruled that if Mr. Hinton knew about any of Milender White's subcontractor agreements he could "certainly be asked about that, and that payment of those depends on a recovery by Curtis Park on this case" (*id.* at 615:1–2). Allied World then cross-examined Mr. Hinton about withholding payment from All Phase (ECF No. 320 at 16; *see, e.g.,* ECF No. 314 at 625:7–25).

Curtis Park argues that Allied World's undisputed failure to request a continuance is fatal (ECF No. 335 at 21). Although filing a continuance motion is not mandatory to satisfy a party's curative obligations, Allied World's limited efforts to cure in this case—raising objections regarding Curtis Park's recovery and ultimately conducting a cross-examination of Mr. Hinton— are insufficient (*id.*). *See Marino*, 839 F.2d at 1412 n.13 ("Rather than moving for a continuance, counsel began an immediate, vigorous, and effective cross-examination of the witness . . . Counsel's cross-examination does not bear the marks of one whose ability to test a witness has been impaired by surprise testimony and his failure to request a continuance suggests that he felt no such impairment."). The Court's conclusion is bolstered by Allied World's failure to pursue *any other* curative measures—beyond rendering objections—and its chief failure to file a continuance motion. *Marino*, 839 F.2d at 1412 n.13; *see also Lipsett v. Univ. of Puerto Rico*, 759 F. Supp. 40, 47 (D.P.R. 1991) ("Rule 59 grants relief to a party which has unfairly been made the victim of surprise, but such relief will generally be denied if the party failed to seek a continuance." (citation omitted)); *Vincent v. Nelson*, No. 16-CV-270-ABJ, 2020 WL 13572075, at *8 (D. Wyo. May 12, 2020), *aff'd*, 51 F.4th 1200 (10th Cir. 2022) ("Here, [the plaintiff] did not request a continuance, undermining his argument of prejudice and surprise." (citation omitted)); *cf. Perkins v. Fed. Fruit & Produce Co.*, 945 F. Supp. 2d 1225, 1256 (D. Colo. 2013) (finding party

sufficiently attempted to cure, despite failing to move for continuance, after cross-examining witness *and* offering testimony of another). Thus, because Allied World has failed to show that it adequately cured the assumed surprise, it has failed to meet its burden of showing that retrial is necessary. *See Breen*, 2015 WL 11051024, at *4; *Senters*, 123 F. App'x at 359.

* * *

Allied World unavailingly seeks retrial. Explained above, at every turn it has failed to meet its burden of showing that relief under Rule 59(a) is proper. *See Nosewicz*, 857 F. App'x at 468; *Burke*, 935 F.3d at 1026. Allied World's Motion for a New Trial Under Federal Rule of Civil Procedure 59(a) (ECF No. 320) is denied.

### III. CONCLUSION

Consistent with the above analysis, Allied World's Renewed Motion for Judgment as a Matter of Law Under Federal Rule of Civil Procedure 50(b) (ECF No. 319) and Allied World's Motion for a New Trial Under Federal Rule of Civil Procedure 59(a) (ECF No. 320) are DENIED.

The Court directs the Clerk to ENTER JUDGMENT consistent with the jury's verdict and C.R.S. § 10–3–1116(1). Accordingly, judgment against Allied World shall be entered as follows:

- $2,541,218.00 for Curtis Park's claim for breach of contract; and

- $5,082,436.00 for Curtis Park's claim for statutory bad faith pursuant to C.R.S. § 10–3–1116(1).

DATED this 31st day of August 2023.

BY THE COURT:

_____

Charlotte N. Sweeney
United States District Judge